## PINNEY and another *against* WELLS.

The existence of a special contract between a common carrier and his employer regarding the services to be performed and the compensation to be paid, does not deprive the former of his right of lien, unless there is something in that contract inconsistent with such lien.

But a credit given, by the contract, to the employer, for the price of the transportation, beyond the time when the property transported is to be delivered and placed out of the carrier's controul, is inconsistent with a lien.

Therefore, where *A*, a manufacturer, and *B*, a common carrier, on the 1st of *May*, 1833, entered into a contract, wherein it was stipulated, that *B* should transport 1500 tons of anthracite coal, belonging to *A*, from *Philadelphia*, and deliver it at *Collinsville*, in this state, between the date of the contract and the 1st of *March*, 1834; that he should deliver some of the coal at *Collinsville*, by the 15th of *June*, 1833, and continue to deliver it there so fast that *A* should not have less than 50 tons on hand at any time between the 1st of *June* and the completion of the contract; that the coal delivered at *Collinsville*, should be shovelled, by *B's* men, into the coal-house of *A ;* that in case of any breach of or detention on the canal, *B* should get the coal along as soon as possible after the breach should be repaired; and in case of such a breach or continued breaches on the canal as should utterly prevent *B* from getting on the coal, he should be excused from getting it on, that season, but should do it the ensuing season, unless *A* should choose to get it round by *Connecticut* river, which he should have the privilege of doing; that *A* should pay *B* for the transportation of the coal from *Philadelphia* to *Collinsville*, 4 dollars, 37½ cents *per* ton; that at the settlement, an interest computation should be made, in which the freight to *Avon*, [a few miles short of *Collinsville*,] and from that place to *Collinsville*, should be considered as cash, whenever 100 tons should arrive at those places respectively; but that *A* should have the privilege of giving his notes, payable at the *Hartford Bank*, instead of paying the cash; all notes so given previous to the 1st of *August*, 1833, to be payable in four months, and all given after that time, to be payable in three months, from the dates thereof; *B* immediately commenced the transportation of the coal under the contract, and before the 10th of *September*, 1833, had transported from *Philadelphia* to *New-Haven*, 1276 tons, of which he had transported 753 tons from *New-Haven* to *Avon*, and 653

tons from *Avon* to *Collinsville*, when *A* failed, and made a general assignment of his property, including the coal at *New-Haven* and *Avon*, in a course of transportation, in the possession of *B ;* and *A*, at different times, between the 28th of *June* and the 9th of *September*, 1833, gave *B* his notes pursuant to the contract, to the amount of 3450 dollars, which were outstanding at the time of *A's* failure, and remain unpaid ; it was held, that this was substantially a contract upon which *B* gave *A* a credit, and that *B* thereby waived the benefit of a lien on the coal in his possession, either for the transportation of the whole, or of the parcels not delivered.

*Hartford,*
June, 1834.

Pinney
*v.*
Wells.

THIS was a bill in chancery ; the object of which was, to obtain from the defendant payment of certain expenses and charges incurred by and due to the plaintiffs, for the transportation of a quantity of coal and grindstones, pursuant to a contract between the plaintiffs and *Collins & Co.*

The contract, dated the 1st of *May*, 1833, was set forth in the bill. It contained, among others, the following stipulations: That the plaintiffs should receive of the *Lehigh Company* 1500 tons of anthracite coal, belonging to *Collins & Co.*, either at *Bristol* or *Philadelphia,* (at the option of the *Lehigh Company,*) and deliver it at *Collinsville*, in the town of *Canton,* between the date of the contract and the 1st of *March*, 1834. The plaintiffs further engaged to receive, at *New-Haven*, a quantity of large grindstones belonging to *Collins & Co.*, and to deliver them at *Collinsville*, within the same period. It was particularly stipulated, that the plaintiffs should deliver some of the coal at *Collinsville*, by the 15th of *June*, 1833, and should continue to deliver it there so fast that *Collins & Co.* should not have less than 50 tons on hand, at any time between the 1st of *June* and the completion of the contract. The coal was to be transported from *Avon* to *Collinsville* in good tight wagons, by careful men, who should see that it was not wasted or lost on the road ; and it should be handled carefully, so as to break as little as possible ; and at the coal-house in *Collinsville*, they were to shovel it all in clear, and not leave it under the wheels. The grindstones, also, were to be transported and handled with care, so as not to deface and injure them. *Collins & Co.* were to furnish help to unload the grindstones, but not to unload the coal. In case of any breach of or detention on the canal, the plaintiffs were to get the coal along as soon as possible after the breach was repaired. *Collins & Co.* were not to pay any extra charges, of

any desciiption, whether occasioned by a breach of the canal or otherwise. And in case of such a breach or continued breaches on the canal as should prevent the plaintiffs from getting on the coal, they 'should be excused from getting it on, that season, but should do it the ensuing season, unless *Collins & Co.* should get it round by *Connecticut* river, which they were to have the privilege of doing.

*Collins & Co.*, on their part, engaged to pay the plaintiffs for the transportation of the coal from *Philadelphia* to *Collinsville*, 4 dollars, $37\frac{1}{2}$ cents *per* ton of 2240 *lb.*; and for the transportation of the grindstones from *New-Haven* to *Collinsville*, 3 dollars, 25 cents, *per* ton of 2240 *lb.*; which sums were to cover all charges upon the coal and grindstones, of every description, including labour, tolls, wharfage, cartage, &c. At the settlement, an interest computation was to be made, in which the freight to *Avon* should be considered as cash, whenever 100 tons arrived there; and the transportation from *Avon* to *Collinsville* should be considered as cash, whenever 100 tons were carted; but *Collins & Co.* were to have the privilege of giving their notes payable at the *Hartford Bank*, instead of paying the cash; all notes given previous to the 1st of *August*, 1833, to be payable in 4 months from date, and all given after that time to be payable in 3 months from date; the plaintiffs being at liberty, at any time, to call for a note to an amount corresponding with the quantity landed at *Avon* or carted to *Collinsville.*

The plaintiffs were common carriers, extensively engaged in the transportation of produce, coal, stone, and other merchandize; and said contract was entered into, in the full expectation of both parties, that the transportation of the coal and grindstones to *Avon* would be completed by the 1st of *November*, 1833, before the closing of navigation for that season on the *Farmington* canal. Immediately after the date of the contract, the plaintiffs commenced the transportation of said coal and grindstones, conforming, in all respects, to the stipulations in the contract, on their part to be performed; and before the 10th of *September*, 1833, had transported from *Philadelphia* to *New-Haven*, 1276 tons of the coal, of which they had transported 753 tons from *New-Haven* to *Avon* and 653 tons from *Avon* to *Collinsville.* The plaintiffs had also transported 150 tons of the grindstones from *New-Haven* to *Avon*, and

*Hartford,*
June, 1834.

Pinney
*v.*
Wells.

105 tons thereof to *Collinsville ;* and all the coal and grind-stones so transported (except the 105 tons of grindstones and the 653 tons of coal delivered at *Collinsville,* and 16 tons delivered to the order of *Collins & Co.* at *Avon,*) remained, on said 10th of *September,* 1833, in the possession of the plaintiffs, at *New-Haven* and *Avon;* and they were then proceeding with the transportation of the remainder, when *Collins & Co.* failed, and assigned said coal and grindstones so in possession of the plaintiffs, and in the course of transportation, to *James H. Wells,* the present defendant, as security for an antecedent indebtedness of *Collins & Co.* to him, and for certain liabilities previously incurred by him in their behalf. Of this assignment immediate notice was given to the plaintiffs ; and shortly afterwards, the defendant, in answer to inquiries from them, wrote them as follows : " As to any debts that may be due from *Collins & Co.* to you, I have nothing to do with them. Any expenses which accrue after the 10th of *September,* on the property of *Collins & Co.* assigned to me, and for which I am legally holden, of course I expect to pay. If the coal can be sold in *New-Haven,* I shall sell it. In the mean time, I wish you to send no more coal up to *Avon,* unless it is in such a situation that it cannot be stopped, without great expense being incurred : if it is on board a boat, let it go on."

On the 1st of *May,* 1833, the indebtedness of *Collins & Co.* was about 50,000 dollars greater than when they failed. They lost about 15,000 dollars in the month of *August* following, by the depréciation in the value of the products of their manufactory, and expended in the course of that summer, large sums of money in sending out agents to sell them ; but they indulged the expectation that they should be able to fulfil all their contracts, especially as their estimate of their property was made upon its first cost, and they considered it, with the facilities of doing business, as much more valuable.

At the time when the assignment was made to the defendant, and subject thereto, an assignment was also executed, by *Collins & Co.,* of the same property, to *Edward Watkinson* and *Thomas C. Perkins,* as trustees for the benefit of all the creditors of *Collins & Co.,* in proportion to their respective claims, pursuant to the provisions of the statute of 1828, relating to fraudulent conveyances.

In addition to the coal and grindstones assigned by *Collins*

& Co. to the defendant, other property was, at the same time, assigned by them to the defendant, and subject to such assignment to the defendant, was also assigned to said trustees; which property, exclusive of the coal and grindstones, was more than sufficient to pay all the indebtedness of *Collins & Co.* to the defendant, but with the coal and grindstones, was insufficient to pay the debts due the other creditors for whose benefit the assignment was made.

In pursuance of the stipulations in the contract, *Collins & Co.* made and delivered to the plaintiffs, the following promissory notes, *viz.* one for 650 dollars, dated the 28th of *June*, 1833, payable in four months; one for 900 dollars, dated *July* 20th, 1833, payable in four months; one for 700 dollars, dated *August* 12th, 1833, payable in ninety days; and one for 1200 dollars, dated *September* 9th, 1833, payable in ninety days. No part of the sums specified in these notes has been paid to the plaintiffs. The two first mentioned notes the plaintiffs procured to be discounted, for their benefit, at the *Hartford Bank*, previous to the failure of *Collins & Co.*; and at the time of their failure, these notes were the property of the *Hartford Bank*, and so continued to be, until after the arrangement now to be mentioned, was made.

On the 14th of *October*, 1833, the plaintiffs delivered the coal and grindstones remaining in their possession to the defendant, and agreed to hold them at all times subject to his order; and in consideration thereof, the defendant agreed with the plaintiffs, that such delivery and agreement should not be deemed a waiver of any lien they had on the property for the expenses of transportation and other charges thereon, which accrued prior to the 10th of *September*, 1833; and that he would pay the plaintiffs, on demand, the amount of such lien, (if any they had,) as it should be finally ascertained, by due course of law, in the proper courts.

The case was reserved for the advice of this court, whether the plaintiffs were entitled to any, and if any, what relief.

*Sherman* and *R. S. Baldwin*, for the plaintiffs, contended, 1. That the plaintiffs, as common carriers, had a lien on the property in their possession for the transportation of the *whole*, unless the terms of the agreement were such as to be *inconsistent* with, or to amount to a *waiver* of the lien. 2 *Kent's*

*Hartford,*
*June, 1834.*

Pinney
*v.*
Wells.

*Com.* 497. 500. *Blake* & al. v. *Nicholson,* 3 *Mau. & Selw.* 168. *Chase* & al. v. *Westmore,* 5 *Mau. & Selw.* 180. *Crawshay* & al. v. *Homfray* & al. 4 *Barn. & Ald.* 50. (6 *Serg. & Lowb.* 346.)

2. That where a contract is *entire* for the transportation or sale of a specific quantity of merchandize, to be paid for on performance, a delivery of *part* before the time of payment, is not inconsistent with a lien on the *residue* for the *whole* price. 3 *Kent's Com.* 501. *Sodergren* v. *Flight* & al. stated by *Holroyd, arguendo,* 6 *East,* 622. Whatever may be *done,* without impairing the lien of a vendor or carrier, may be *agreed* to be done, without being a waiver of a lien.

3. That the agreement in this case is not inconsistent with a lien, because it required a delivery of the property before the time of payment arrived. The plaintiffs were not bound to *deliver* the property at *Collinsville,* (except the 50 tons in advance) before the 1st of *March,* 1834, when payment was to be made. The coal was to be at *Avon,* in *October,* 1833, when the carriers would be entitled to receive notes at ninety days, for the whole expense of transportation, except the land carriage to *Collinsville.* These notes would, of course, all become payable a month before the time when the plaintiffs were bound to deliver the coal at *Collinsville.* Consistently, therefore, with the terms of the contract, the plaintiffs would, for aught that appears to the contrary, have had, at all times, property in their possession sufficient to secure the payment of the charges of transportation. Thus far, then, there is nothing from which it can be inferred, that they intended to waive any lien.

4. That the agreement is not inconsistent with a lien because it substitutes the notes of *Collins & Co.,* as independent securities, instead of a lien. The notes to be given by *Collins & Co.* were not intended as *payment,* but as advances to be applied in payment on the final settlement, after performance of the entire contract, when an interest computation was to be made. One simple contract is never deemed payment of another, unless specially so agreed to be. *Davidson* v. *Bridgeport,* 8 *Conn. Rep.* 472. *Bill* v. *Porter,* 9 *Conn. Rep.* 23. 30, 1.

5. That the lien has not been waived, wholly or in part, by the acts of the plaintiffs *subsequent* to the agreement. First, the lien is not affected, by the delivery of part; for the con-

tract is an *entire* one for the transportation of 1500 tons belonging to the plaintiffs. It is to be regarded as *one shipment,* in reference to the carrier's lien. *Sodergren* v. *Flight* & al. 6 *East,* 622. *Waddington* v. *Oliver,* 2 *New Rep.* 61. *McMillan* v. *Vanderlip,* 12 *East,* 165. *Blake* & al. v. *Nicholson,* 3 *Mau. &. Selw.* 167. Though part is delivered, the vendor's lien on the residue remains. 2 *Kent's Com.* 501. Secondly, the notes were not received as applicable to particular parcels transported; but the avails were to apply, on a final settlement, on the contract generally. Payment was to be *entire* for the performance of *the whole.* Consequently, the reception of particular parcels (even if *Collins & Co.* had not been insolvent) would have been no waiver of the lien. Thirdly, the fact that two of the notes were out of the hands of the plaintiffs, when *Collins & Co.* failed, makes no difference with respect to the lien.

6. That if the foregoing positions are untenable;—if the contract was not entire, but consisted of distinct parts, to be performed separately; and consequently, the notes which were stipulated to be given, and which were received by the plaintiffs instead of cash, were applicable to the parcels previously transported, and not on the contract generally, and of course, the plaintiffs had no lien on the coal remaining in their possession for the transportation of that which had been delivered, and for which notes had been received, as stipulated in the contract; yet the plaintiffs had the right of retaining each parcel until the giving of the notes which they had stipulated to receive, *instead of cash,* for its transportation. The plaintiffs did not stipulate to give a *general* credit to *Collins & Co.,* as in *Chandler* & al. v. *Belden,* 18 *Johns. Rep.* 157., relying on the contract alone to enforce payment. They stipulated, that if *Collins & Co.* should not find it convenient to pay the *cash,* on the delivery of each 100 tons, but should prefer paying interest, they would receive, *instead* of cash, their note at ninety days, payable at the bank, on which the cash for which it was substituted, could be realized at pleasure. As the right to require such a note accrued on the arrival of each 100 tons at *Avon,* and as there was nothing in the contract *inconsistent* with the plaintiffs' retaining possession until such note was given, it follows, that as common carriers, on the established principles of the common law, they could not have been com-

pelled, by *Collins & Co.*, to part with the possession, until the giving of a note payable at the time and place specified in the contract. *Tate* & al. v. *Meek*, 8 *Taun.* 280. *Yates* & al. v. *Railston*, 8 *Taun.* 293.

Now, whatever the plaintiffs had a right to require of *Collins & Co.*, on the arrival of each 100 tons at *Avon*, before they were compellable to part with the possession, they must have the same right, at any intermediate place, at which the further transportation is stopped, by direction of *Collins & Co.* or their assignee. Although by the terms of the contract, the freight was not due until the arrival of the coal at *Avon ;* yet when *Collins & Co.*, or the defendant, in whom they had vested the right of property and the controul, prohibited the further transportation, it released the carriers from the residue of their engagement, and gave them, consequently, the same right to detain the property at *New-Haven*, until their charges were paid or secured, in the stipulated mode, that they would have had at *Avon*, if there had been no prohibition. *Champion* v. *Hartshorne*, 9 *Conn. Rep.* 564. 568. If then, the plaintiffs had a right to detain the property in their possession at *New-Haven*, or in other words, had a *lien* upon it, until a tender of such notes for the amount of the transportation as the contract allowed *Collins & Co.* the privilege of giving instead of the cash, it follows, that when the defendant, on the 14th of *October*, engaged, on the delivery of the property to him, to pay the plaintiffs, on demand, the amount of such lien, if any, as it should be ascertained they had, he contracted an obligation, which, when it should become payable at all, would be payable, not in *Collin's & Co's* notes, or in his own notes, but in cash.

In the preceding views, it has been assumed, in accordance with the principle recognized in *Miller* v. *Ward* & al. and in *Champion* v. *Hartshorne*, that the plaintiffs were entitled, after the prohibition of the defendant, to claim as for a full performance, in *affirmance* of the contract. It might perhaps be claimed, that they were also at liberty to consider themselves as released from the contract, and the contract itself as waived, and to seek remuneration for what they had actually performed, as on a *quantum meruit*, in *dis-affirmance* of the contract ; in which case, whatever might have been its terms, they would have been entitled to freight, and consequently, to a lien,

HARVARD LAW LIBRARY

as common carriers, in the same manner as if no special contract had ever been made.

*Hungerford* and *T. C. Perkins*, for the defendant, contended, 1. That the right of lien is waived, where the contract contains any stipulations *inconsistent* therewith, or from which a waiver may be *implied*. 2 *Kent's Com.* 500.   4 *Campb.* 150. n.    *Yelv.* 67. *d.* 67. *i.* (*Met. ed.*) *Cowell* v. *Simpson,* 16 *Ves.* 279. 281.    *Chandler* & al. v. *Belden,* 18 *Johns. Rep.* 157. 162, 3.

2. That the contract under which the transportation, in this case, took place, was inconsistent with the right of lien ; because the right of retaining possession of the property until the freight should be paid, was indispensable to the existence of a lien ; and it appears from the contract, that the plaintiffs were to part with the possession before the freight was to be paid. This appears from the following considerations.

First, although the freight was to be considered as *cash*, whenever 100 tons of coal arrived at *Avon,* and the freight from *Avon* to *Collinsville,* was to be so considered, whenever 100 tons arrived at the latter place ; yet *Collins & Co.,* if they chose, had the privilege of giving their notes for it payable at a future time.

Secondly, it is obvious that the parties did not contemplate a delivery of all the coal or all the grindstones, at one time, or in one parcel, but at different times and in different parcels, although under an entire contract.   The plaintiffs were to keep *Collins & Co.* supplied, in such manner, as that they should have 50 tons in advance, at all times, at *Collinsville,* from the 1st of *June* until the completion of the contract.   It does not appear from the contract, what quantity of coal was expected to be consumed, in a given time ; but unless the consumption was such as, in order to keep *Collins & Co.* supplied with 50 tons in advance, to require all the coal sooner to be delivered, the plaintiffs had until the 1st of *March* 1834, to complete the transportation.   Hence, as well as from other parts of the contract, it appears, that the parties did not contemplate a delivery of all the property at once.

Thirdly, from the manner in which the property was to be transported from *Avon* to *Collinsville, viz.* by wagons, and from the fact that the plaintiffs were to keep 50 tons in advance

at *Collinsville,* it is clear, that the parties contemplated the delivery of the property at *Collinsville,* in parcels of less than 100 tons each. Whenever any portion of the coal or grindstones arrived at *Collinsville,* it was to be delivered to *Collins & Co.;* as the contract speaks of "shovelling the coal into the coal-house,"—of *Collins & Co.* "furnishing help to unload the grindstones,"—and of " the teams not being detained," &c.

Fourthly, as all the property was to be delivered under an entire contract, if the lien attaches to one part, it is difficult to see why it should not attach to another ; as no distinction is made between one parcel and another, in the contract. Suppose, then, that by the 15th of *June,* 1833, there had been more than 50 and less than 100 tons of coal transported from *Avon* to *Collinsville,* the plaintiffs would have been bound to deliver it, and could not have justified themselves in retaining it for the transportation from *Avon* to *Collinsville.* Suppose they had delivered, in different parcels, to the amount of 100 tons, and taken the note of *Collins & Co.* until they had delivered to the amount of 100 tons more ; they had no right to insist upon payment, either in money or by note; and the same remarks would hold true in regard to all the subsequent parcels to be delivered. Hence, it is clear, that the parties contemplated a delivery of all the property at *Collinsville, upon credit.*

Fifthly, no distinction, in this respect, is made between the property carried to *Avon* and that to *Collinsville.* The whole was to be transported by way of the canal, in boats, from *New-Haven* to *Avon.* From the manner in which it was to be transported, the parties could not have supposed, that it was to be carried to *Avon* in parcels of 100 tons or more, each ; nor is there any intimation in the agreement, that 100 tons were to be transported to *Avon,* and deposited there, before any part of it was to be conveyed to *Collinsville.* Suppose a parcel or parcels had been conveyed to *Avon,* amounting to 90 tons and no more, and 50 of these 90 tons forwarded to *Collinsville;* the plaintiffs must, at *Collinsville,* have delivered the 50 tons, without any right to insist upon the payment of freight there, in any form ; nor could they any more insist upon the payment of freight for the transportation to *Avon,* either in money or by note,—inasmuch as the plaintiffs had no right to exact a note

*Hartford,*
*June, 1834.*

Pinney
*v.*
Wells.

until 100 tons should have been delivered.   The same would be true, also, in regard to all parcels not amounting to 100 tons, subsequently delivered at *Avon.*

Sixthly, in addition to what has been before suggested, it does not appear from the agreement, nor from the finding of the court, that there was any distinct price agreed upon for the transportation of the coal from *Philadelphia* to *Avon,* or of the coal or grindstones from *New-Haven* to *Avon,* or from *Avon* to *Collinsville.*   How, then, unless by a subsequent mutual agreement between the parties, could either of them determine the amount to be paid for the transportation of the property to *Avon,* when each 100 tons arrived at that place? The price was fixed by the parties for the transportation of the property through the *whole* line or distance it was to be carried ; but there seems to be no rule given, by which the freight for *a part* of the distance can be apportioned.   It is not easy, then, to understand what sum might be insisted upon by the plaintiffs, or must be tendered by *Collins & Co.,* on the arrival of each 100 tons at *Avon.*

In conclusion, if at the last end of the whole line of transportation, the plaintiffs had no lien upon the property, nor at *Avon,* at what time or place does their lien first exist or terminate ?   If the whole transportation was done, as it was under an entire contract, it would be very singular, that it should exist at any intermediate point between *Philadelphia* and *Avon* or *Collinsville,* and yet should cease the moment the property arrived at either of the two latter places ; and that by virtue of the contract merely, under which every part of the transportation had taken place.

3. That the right of lien, in this case, does not, in any respect, depend upon the question whether *Collins & Co.* were *solvent* or *insolvent.*   If the point were whether the plaintiffs had a right of stoppage *in transitu,* the condition of *Collins & Co.* might be very material ; but the question of lien or no lien, in this case, is entirely foreign to the doctrine of stoppage *in transitu.*

WILLIAMS, J.   Upon a bill in chancery, the plaintiffs claim the aid of this court to give them the benefit of a lien for freight of certain coal and grindstones, in their possession, assigned by *Collins & Co.* to the defendant, under a contract

*Hartford,*
*June, 1834.*

Pinney
*v.*
Wells.

made by the plaintiffs, with *Collins & Co.* It is not claimed, that a court of equity would interpose where there was no lien at law; (*2 Meriv.* 403.) but that having parted with the possession under an arrangement with the defendant, this court should give them the benefit of that arrangement.

The general rules of the common law respecting this subject of lien, are now well settled. In consideration of the liability imposed upon persons conducting certain business, or engaged in certain trades, or on account of the usage of trade, the law recognizes a right in those whose services or expenditures have contributed to enhance the value of the property of others in their hands, to retain possession of that property, until compensation has been made for that labour and those expenses.

This right or privilege, called *a lien,* is for the benefit of trade. In consideration of the nature of the services and liabilities of the common carrier, he is as justly entitled to the benefit of such lien as any class of persons whatever.

The plaintiffs found their claim upon the rights of common carriers. But it is claimed by the defendant, that they have entered into a special contract, which deprives them of that right. As this privilege was intended for the security of him who performed the services or incurred the expenses, such person may always waive it, or deprive himself of the benefit, which the law indulged him with.

As this benefit was particularly designed for those with whom no particular contract was made, who reposed merely upon their legal rights, an opinion seems formerly to have been entertained, by authorities highly respectable, that wherever there was a special contract between the parties, no lien could exist.

That doctrine was examined and denied, by the court of *King's Bench,* in a modern case, and in an elaborate opinion given by Lord *Ellenborough,* it was proved to be contrary to reason and to the principles of law. *Chase* v. *Westmore,* 5 *Mau. & Selw.* 180. 183. & seq. See also the cases collected and well arranged, by the *American* editor of *Yelverton's Reports, p.* 67. a. n. And the rule may now be considered as settled, that a lien may exist, although there is a special contract, unless there is something in that contract inconsistent with such lien, or unless it is waived expressly, or by fair implication.

Thus, in *Cowell* v. *Simpson,* 16 *Ves.* 275. 280. where a

*Hartford,*
*June, 1834.*

Pinney
*v.*
Wells.

solicitor took the notes of the executor of his employer, payable in three years, it was held, that by necessary implication, he agreed to give up the papers and rely upon the security; and the Lord Chancellor said, that if a lien commenced under an implied contract, and afterwards a special contract was made for payment, in the nature of the thing, one contract destroys the other.

So where the defendant agreed to transport salt from *Turk's Island* to *New-York,* 500 dollars to be paid in advance, the balance in three equal payments at 30, 60 and 90 days after its arrival in *New-York;* 500 dollars having been paid, the defendant claimed a lien for the balance of freight. But the court decided, that this right growing out of the usage of trade, did not exist, and could not be enforced, where the parties had expressly regulated the time and manner of paying freight, by stipulation in a charter-party; especially, if the cargo is to be delivered before the period of payment arrives. Such an agreement, it was said by Ch. J. *Spencer,* was an express renunciation of the right to insist on freight before the cargo was delivered. *Chandler* & al. v. *Belden,* 18 *Johns. Rep.* 157. 162. The same principle is recognized in *Crawshay* & al. v. *Homfray* & al. 4 *Barn. & Ald.* 50. (6 *Serg. & Lowb.* 346.) And in *Raitt* v. *Mitchell* & al. 4 *Campb.* 149. Lord *Ellenborough* says, a lien is wholly inconsistent with a dealing on credit, and can only subsist where payment is to be made in ready money, or there is a bargain that security shall be given the moment the work is completed. And this principle is recognized by Chancellor *Kent.* 2 *Kent's Com.* 635. 1st ed.

This principle has also been extended to cases where there was no express agreement to give credit, but where, by the usage of trade, a credit might be claimed. Thus in *Raitt* v. *Mitchell* & al. 4 *Campb.* 146. a ship was taken to a dock to repair, and great expenses incurred, by the ship-wright; it being proved, that by usage the ship owner might demand a credit, it was held, that there was no lien.

So where goods were landed upon a wharf in *October,* and by usage, wharfage was not payable until *Christmas,* it was held, that there could be no lien. *Crawshay* & al. v. *Homfray* & al. above cited.

The question between these parties, then, depends less upon doubtful questions of law, than upon the application of princi-

*Hartford,*
June, 1834.

Pinney
*v.*
Wells.

ples that are well settled. Are the terms of the contract between *Pinney & Co.* and *Collins & Co.* inconsistent with the claim of lien now made by the former?

This contract is dated the 1st of *May*, 1833, and was to be completed by the 1st of *March*, 1834; although, as the bill states, it was the expectation of the parties, that it should be so completed by the 1st of *November*, 1833. The plaintiffs undertake to transport a quantity of grindstones from *New-Haven* to *Collinsville*, and coal from *Bristol* or *Philadelphia* to *New-Haven, Avon* and *Collinsville;* both to be landed at *Avon*, and carted to *Collinsville;* some of the coal to be delivered at *Collinsville*, by the 15th of *June*, then next, and the residue so that not less than 50 tons should be at *Collinsville* on hand, at all times after, until the whole was delivered; and the grindstones to be delivered so fast that no inconveniences should be sustained from the delay; both to be weighed at *Collinsville*, and the coal to be by the plaintiffs shovelled down into the coal-house. The *Collinses*, on their part, agree to pay the sums fixed for transportation, and at the settlement, an interest computation is to be made, in which the freight to *Avon* is to be considered as cash, when 100 tons arrive there, and the freight from *Avon* to *Collinsville* as cash, whenever 100 tons arrive there. But instead of paying cash, *Collins & Co.* are to have the privilege of giving their notes at the *Hartford Bank*, at 4 and 3 months; the plaintiffs having a right to call for such note, when 100 tons are landed at *Avon*, or carted to *Collinsville*.

The plaintiffs, then, instead of relying upon their legal security, explicitly agreed to go on with this contract, and land at least 100 tons at *Avon*, or the like quantity deliver at *Collinsville*, before they could demand any pay; and then, instead of requiring what their lien would entitle them to, they agree to take *Collins & Co's.* note at 4 months, until *August*, and then at 3 months; and so far as it respects the coal at *Collinsville*, it is expressly to be placed out of their controul, in *Collins & Co.'s* coal-house, before the note could be required.

It is said, however, that these notes *Collins & Co.* have liberty to give, but they are considered as *cash* by the parties: it is only a *privilege* to *Collins & Co.* But it is the ordinary privilege to a man in business of substituting credit for cash, enhanced perhaps from the fact, that *Collins & Co.* had their

election ; but as it was at *their* election, and not at the plain-
tiffs' pleasure, it is apparent, that the lien was lost sight of.
The privilege of a credit to the owner seems inconsistent with
the idea of the privilege of a lien in the carrier.

The plaintiffs further claim, that they had, at least, a lien
for *Collins & Co.'s* notes, when 100 tons were delivered at
*Avon,* or at *Collinsville.* As to the latter, it is entirely incon-
sistent with the idea, that the coal was actually to be delivered
by them in the coal-house ; and without deciding whether
when one hundred tons were landed at *Avon,* they were bound
to do more, unless *Collins & Co.* would give their note, it does
not seem therefore to follow, that this contract was not sub-
stantially a contract upon which they agreed to give *Collins &
Co.* a credit. *Collins & Co.* were not, indeed, bound to accept
the credit, to the extent allowed ; and if they refused to give
their note, it might be said, they did not choose to accept the
credit.

But the plaintiffs, by the contract, having left it at the op-
tion of *Collins & Co.,* must have waived the benefit of their
lien ; otherwise, instead of the certain privilege given them by
law, they have a privilege, depending, not on the law, but on
the will of the opposite party.

Again, it is said by the plaintiffs, that this contract is *entire,*
although to be performed at different times ; and that a lien
may exist upon the part not delivered for that which had been
delivered.

Upon examining this contract, it appears, that as it respects
the grindstones, they were to be delivered at *Collinsville,* as
fast as the convenience of *Collins & Co.* required ; and after
the 15th of *June,* the plaintiffs were always to have at *Collins-
ville* 50 tons of coal, at least, on hand, beyond that used. Un-
der these stipulations, it can hardly be believed, that it was
contemplated, that the plaintiffs should retain enough in their
possession to secure them for the transportation of the whole.

Nor are any *data* given to shew how many tons of coal
would be necessary to keep the manufactory at work, and
leave the requisite quantity with the plaintiffs ; nor was there
any limitation imposed upon *Collins & Co.* as to the quan-
tity they would consume, unless it is to be conjectured from the
fact, that all was to be delivered by the 1st of *March,* 1834.
That, however, must, when construed with the other parts of

*Hartford,*
June, 1834.

Pinney
*v.*
Wells.

the contract, be understood to mean nothing more than that, whether the coal and grindstones were wanted or not, all should be delivered by that time. But if the plaintiffs went on to deliver 100 tons, by the 15th of *June*, and received their note for that quantity, payable at four months, and then went on with the rapidity in fulfilling this contract, which they, in their bill, say was expected, and which they say would have been performed during the month of the ensuing *October*, it is apparent, that most of the coal, &c. must have been delivered before the first note would have become due, *viz.* the 18th of *October ;* and at all events, a very small part of the freight money could have been due, at the time when the parties expected, that all this contract, on the part of the plaintiffs, would have been completed. Under these circumstances, it seems to me apparent, that this contract is utterly inconsistent with a right of lien in the plaintiffs.

Besides this, the contract provides, that if breaches shall happen in the canal, so as to render it impracticable for the plaintiffs to get up the coal, *Collins & Co.* may, if they choose, get it round by *Connecticut* river. In that view, what becomes of the lien of the plaintiffs?

In every view, then, which can be taken of it, it seems, that the plaintiffs have relied upon the personal credit of *Collins & Co.*, and abandoned their claim of lien.

It was however further urged, by the plaintiffs, that the *insolvency* of the *Collinses*, might make a difference. Such claims are seldom made, and seem to be of no use, unless insolvency has intervened. If, therefore, that fact varied the right of the parties, it would seem as if the cases would shew it. No such cases have ever been shewn.

But it is claimed in analogy to the cases of stopping *in transitu*. Those cases exist only between vendor and vendee ; and certainly do not depend upon retaining possession. The very terms imply, that possession has been given up. Here, the lien, where it exists at all, depends upon the possession. There, insolvency only gives the right. Here, the right certainly does not arise from insolvency, but exists as completely, where the owner of the goods is a *Girard*, as where he is a bankrupt. Besides, if the analogy is pursued, it might extend further than would be consistent with the plaintiffs' claims ; as in that case, after an assignment made *bona fide*, the right

would no longer exist.    But it is believed, there is no analogy between the cases.

In the two cases above cited of *Crawshay* & al. v. *Homfray* & al. and *Chandler* v. *Belden,* insolvency had intervened, but did not revive the lien.    If the foregoing reasoning is correct, here never was any original lien : of course, there was none to revive ; and subsequent events could not create one.    It being settled, that the terms of this contract, by reasonable implication, excluded the lien which the law would have raised, I know of no principle of law, certainly no case has been presented, which proves, that such a lien can afterwards arise.

The same answer may be given to the plaintiffs' claim, that they may retain for the freight of the goods on hand, when they stopped the further transportation.

If by the contract originally made, they waived any claim for freight, and instead of leaving their payment to the implication of law, they contracted to give a credit for the freight, then whether they had parted with possession or retained it, they must look only to the contract they had entered into, for their security.

Such being the situation of the plaintiffs, as it respects *Collins & Co.,* they can claim nothing more of the defendant, unless he has assumed a new responsibility by his letters, which form a part of the case.

That has not been seriously contended.    It is enough to remark upon that correspondence, that as the plaintiffs did not intend to give up any right or obligation, by the delivery of the coal, so neither did the defendant intend to assume any other liability than that by law before imposed upon him.    And it cannot be necessary to examine this correspondence minutely, to declare, that he has not assumed such responsibility, but that the parties are, in that respect, in no better and in no worse situation, than they would have been, had the correspondence never existed.

I should, therefore, advise the superior court, that the plaintiffs can take nothing by their bill.


The other Judges were of the same opinion, except Peters, J., who was absent.

Bill to be dismissed.